IN RE CÉSAR ANDRÉU RIBAS, Respondent.

No. 95. Submitted April 25, 1958.—Decided March 12, 1959.

*J. B. Fernández Badillo, Secretary of Justice,* in his own right and represented by *José C. Aponte* and *Guillermo A. Gil, Special Prosecuting Attorneys at Large. Félix Ochoteco, Jr., Jorge L. Córdova Díaz, Gabriel de la Haba, Benicio Sánchez Castaño,* and *Manuel García Cabrera* for respondent.

MR. JUSTICE HERNÁNDEZ MATOS delivered the opinion of the Court.

The Secretary of Justice, Juan B. Fernández Badillo, in his own right and represented also by José C. Aponte and Guillermo A. Gil, Special Prosecuting Attorneys at Large, filed in this Court, on February 20 of last year, a complaint of disbarment against César Andréu Ribas, attorney at law, preferring the following charges against him:

"FIRST CHARGE

"That on March 25, 1957 and while practicing the profession of attorney-at-law, respondent César Andréu Ribas filed in the office of the Clerk of the Superior Court, Bayamón Part, in the case of The People of Puerto Rico v. Miguel Angel Marín Canals, criminal case No. M-56-251, for violation of § 6 of the Weapons Act of Puerto Rico, a motion dated March 21, 1957 and entitled 'Motion for Amendments to the Transcript of Evidence' which copied literally reads thus:

" 'Defendant appears through his undersigned attorney and sets forth:

" '1. That he received copy of the transcript of evidence prepared, certified and filed by the reporter stenographer Juan Amaral, and as it is pending approval by this court, for the purposes of perfecting the appeal filed against the judgment entered by the court, defendant submits the following amendment:—

" '1. When District Attorney Grajales finished presenting his evidence and after policemen Aureliano Díaz and Manuel Ralat had testified, Judge Fernando Gallardo asked the District Attorney Grajales:

" 'Is that all the evidence?' and upon the district attorney answering affirmatively, the judge ordered the marshal to remove the jury from the courtroom, and there ensued a lengthy dialogue between the judge and the district attorney, more or less in the following terms:

" '*Hon. Judge:* Do you mean to tell me that this case occurred in a bar there in Cataño, which is two minutes from here, and you only bring the two policemen to testify, and you did not take the testimony of the owner or the manager of the bar or of any other person? Remember that I have the responsibility of deciding one of these two cases, that one is felony and the other misdemeanor, and that investigation is very deficient. When I was district attorney in Guayama and in San Juan, and we had a case like this, I was not satisfied with what the police would tell me but I would go to the place, take the testimony of all the witnesses and anyone who might have been present, even if it was just to tell me that they did not know anything about the case. In that way the defense could not bring those witnesses to say that they saw this or that because I already had them tied up with the testimony that they knew nothing.

" '*District Attorney Grajales:* That is all the evidence for The People, and that is the case. I can do nothing else.

" '*Hon. Judge:* Well, you see, now the defendant brings the manager of that place and other persons who witnessed the arrest, he has them outside as witnesses and The People could have investigated them before. Recess.'

" '2. That these statements were made by the magistrate and the district attorney during the trial, that they form part of what occurred and should be wholly transcribed and yet have been unduly stricken when they should be inserted in the proper place in the transcript of the evidence.

" '3. That during the recess the counsel for the defendant approached Mr. Amaral, and later in the latter's own office, managed to have the remarks which do not appear now in the transcript read to him, whereby he has reason to believe that this has not been nor happens to be an involuntary omission in

transcribing his notes but rather that those remarks were stricken from the transcript after the court knew of defendant's intention to appeal as stated in open court, upon requesting bail to do so.

" 'For these reasons, defendant urges this court to order reporter stenographer Juan Amaral to insert in the proper place in the transcript of evidence (p. 48, before adjourning for lunch and after having introduced in evidence the pistol and the bullets, without defendant's objection), all the words, phrases and remarks previously transcribed and proposed as amendments by the defendant, which were said in open court at the trial by Judge Fernando Gallardo Díaz, and addressed to District Attorney Grajales, as well as the ones made by the latter, so that the complete transcript be sent to the consideration of the Hon. Supreme Court of Puerto Rico, to which defendant is entitled.

" 'San Juan, Puerto Rico, March 21, 1957. (Sgd.) C. Andréu Ribas, counsel for defendant-appellant.

" '*Service by Mail*

" 'I certify that I have sent copy of this motion to Fernando Grajales Ortiz, District Attorney (Assistant), at his office in the Superior Court of Puerto Rico, Bayamón Part, today, March 21, 1957. (Sgd.) C. Andréu Ribas.—C. Andréu Ribas.—Superior Court of P. R., Bayamón Part. Initialed: Francisco Vázquez Ríos.—1957 MAR. 25 PM 4:46. Bayamón Part.' "

"That in drafting and filing the above-copied motion, respondent behaved in an immoral and improper manner unbecoming an attorney, consisting that in paragraph 3 therein he made the implied charge that, after the court knew of defendant's intention to appeal, there was connivance between the court and the stenographer Juan Amáral in order to strike, as was struck from the transcript of evidence, an incident which occurred during the hearing of the case between Judge Gallardo and District Attorney Fernando Grajales, with the alleged malicious purpose of depriving the defendant of the right to assign as error in the appeal the remarks uttered by Judge Gallardo in said incident concerning the quality of the evidence for the prosecution; that the said charge is false and was made by the respondent attorney without proof of its certainty and without

any probable cause or ground to believe in the truth thereof, and with the malicious intention of impairing the honesty and integrity of the court and of the Judge, Mr. Gallardo, all in violation of the duties that respondent, as an attorney, owed said court and judge.

## "Second Charge

"That on May 3, 1957, while respondent César Andréu Ribas was practicing as attorney at law and representing the defendant in the hearing of a Motion for Amendments to the Transcript of Evidence filed by respondent in criminal case No. M-56-251, entitled 'The People of Puerto Rico v. Miguel Angel Marín Canals,' for a violation of § 6 of the Weapons Act of Puerto Rico, in the Superior Court of Puerto Rico, Bayamón Part, respondent observed in the courtroom an immoral and improper conduct unbecoming an attorney and in detriment to the prestige, the dignity and good name of the court and the administration of justice, consisting in that when the presiding magistrate, Hon. Fernando Gallardo Díaz, called his attention as to the manner in which respondent had drafted the said Motion for Amendments and before the judge could refer to the charge contained therein and to which the preceding charge refers, the respondent interrupted him in a contemptuous and insolent attitude, there ensuing between respondent and judge an interchange of words, uttered in a defiant tone and attitude, as a result of which the judge violently came down from the bench, both using obscene and offensive language in a loud voice, giving rise to the ensuing disorder and the interruption of the proceedings in court, calling for the intervention of several attorneys and officers of the court, to prevent physical assaults between both of them."

Petitioner prayed that César Andréu Ribas be removed permanently from his office of attorney or in default thereof that he be punished or disciplined as the Court may deem most appropriate under the circumstances.

Respondent answered through Mr. Félix Ochoteco, Jr., Mr. Benicio Sánchez Castaño, Mr. Manuel García Cabrera, Mr. Jorge L. Córdova Díaz, and Mr. Gabriel de la Haba, alleging as follows:

*"Reply to the First Charge*

"1. Respondent admits having drafted and filed in court on the date and in connection with the above-entitled complaint, the 'Motion for Amendments to the Transcript of Evidence' copied in the first Charge.

"2. Respondent, in setting forth, as he did set forth in paragraph 3 of the said 'Motion for Amendments to the Transcript of Evidence,' that he had reason to believe that the omission of the incident which is recited in the first paragraph of said motion had not been an involuntary omission of the stenographer in transcribing his notes but that it had been stricken from the said transcript after the court knew of defendant's intention to appeal as he had stated in open court and after requesting bond, respondent alleges that he had well-grounded reasons to believe, as he believed in good faith, that such involuntary omission did not take place on stenographer Juan Amaral's initiative, respondent basing said grounds on the following facts:

"(A) Because said stenographer Juan Amaral notified respondent on January 25, 1957, immediately after the judgment appealed from had been entered and after respondent conferred with him and the latter read to respondent the incident from the stenographic notes and the deponent attorney had compared with Mr. Amaral said reading with the notes taken by him during the trial, that the said stenographer could not guarantee the party thereto that said incident, subsequently omitted, would appear in the transcript of evidence, since the stenographer had instructions from the judge of said court, that prior to his notifying the parties with copies of transcripts of evidence requested for filing an appeal, he had to submit them to his consideration.

"(B) Because in order to cause such elimination the said stenographer had to skip or fail to transcribe at least fourteen pages of stenographic signs, which in turn represent the five typewritten pages which comprised the incident in question, which led respondent to conclude in good faith, that it was not a mere omission due to clerical error.

"(C) Because to any attorney with respondent's experience, having a professional practice of twenty-two years, it appeared to be, as it was, significant that precisely the portion omitted by the stenographer in said transcript was the only incident during the trial which favored defendant's contention as to his inno-

cence, and in view of the appeal taken by him, since said incident referred to the statements made by the presiding judge at the close of the evidence for the People, by virtue of which he classified said evidence insufficient and rebuked the public prosecutor for not having tried to offer better evidence.

"(D) Because respondent had the moral conviction that this was not an involuntary omission on the part of the stenographer, but rather a deliberate striking, and besides, respondent considers that said stenographer had no interest in the outcome of the appeal.

"(E) Because knowing, as respondent had known for at least twenty years, that Juan Amaral was a competent reporter stenographer due to his experience as such for more than twenty-five years, respondent could only reach the conclusion, as he did, in good faith, that such omission was not a mere oversight of error of said stenographer but a voluntary omission of an essential part of the stenographic record.

"3. That notwithstanding the fact that respondent on the above-stated grounds believed in good faith, as he did believe, that such omission had not been of a clerical nature, and therefore, not involuntary, the petitioner in his desire to raise the question of such omission as discreetly as possible, but without failing his professional duty for his defendant, only limited himself to alleging in said third paragraph of the afore-mentioned 'Motion for Amendments to the Transcript of Evidence' that respondent . . . 'has reason to believe that it has not been nor happens to be an involuntary omission in transcribing his notes but rather that those statements were stricken from the transcript after the court knew of defendant's intention to appeal as stated in open court, after requesting that bond be fixed to do so,' and that the underlying reason for his motion was to have the court not only order the inclusion of said omitted incident, but also to investigate the reason for said omission.

### "Reply to the Second Charge

"4. Respondent admits that on May 3, 1957 and at the hearing of the 'Motion for Amendments to the Transcript of Evidence' referred to in the First Charge, an incident took place at said hearing in the Superior Court of Puerto Rico, Bayamón Part, between the presiding judge and the respondent as attorney for defendant Miguel Angel Marín Canals, and respond-

ent also admits that as a consequence of said incident, the ensuing disorder arose, causing the interruption of the proceedings of that court; but respondent alleges that said incident was begun and provoked without any reason whatsoever by the presiding judge himself and with no fault whatever on the part of the petitioner, when said judge proceeded, then and there, to offend, provoke, challenge and humiliate respondent by words and acts, in a threatening attitude to assault and injure him in the presence of many practicing attorneys and a large public who was attending the court session, respondent having limited himself to answering the offenses, provocations, challenges, and humiliations of which he had been victim on the part of said magistrate.

"5. That with respect to the averments in the fourth paragraph *supra*, respondent denies that as a result of said incident he behaved immorally and improperly before the Superior Court of Puerto Rico, Bayamón Part, since he only limited himself and according to what has been previously set forth, to answering the offenses, provocations, challenges, and humiliations of words and acts addressed to respondent then and there by the presiding judge; offenses, provocations, and challenges that said magistrate repeated and had published in an interview with editor Víctor M. Padilla, of the newspaper 'El Mundo,' issue of Tuesday, May 7, 1957, upon stating among other things the following: 'I am not taking any complaints against him to any court or the Grievance Committee of the Bar Association. Men act differently.'

"6. Respondent denies that said incident occurred before the said magistrate had the opportunity to refer to the allegations contained in said third paragraph of the 'Motion for Amendments to the Transcript,' in question, and on the contrary, respondent alleges that such incident was only due to said magistrate's ungrounded resentment when in reading the 'Motion for Amendments to the Transcript of Evidence' he noticed that respondent merely called him 'Mr. Judge,' and not 'Honorable Judge,' respondent alleging that his omission of such modifier was no reason or excuse for said magistrate to provoke and begin said incident and offend, mistreat, challenge, and humiliate respondent with words and acts, as said magistrate did.

"7. Respondent alleges, furthermore, that said incident was provoked by said magistrate, moved solely by the apprehension

that he has felt at all times against respondent, due to the relationship of open enmity or resentment that has existed on the part of the judge presiding the trial against respondent, which resentment has always existed since several years, leading respondent to believe in good faith that that resentment flared up when shortly before the trial in the cases of The People v. Miguel Angel Marín Canals, respondent undertook, with the knowledge of said magistrate, the defense of the wife of said judge's brother, respondent having obtained for his client, through his professional intervention, more than $140,000 which the judge's brother had to pay in the said suit and as her share in the conjugal partnership. (Civil case No. 54-1100 of the Superior Court, San Juan Part.)

### "Special Defenses Common to Both Charges

"I—That said complaint does not state sufficient facts in either of its two charges, warranting the request of the Hon. Secretary of Justice of the Commonwealth of Puerto Rico that respondent be suspended from the practice of his profession by this Honorable Court.

"II—That the conduct observed by respondent with respect to the two incidents recited in the two charges of the complaint was at no time immoral and improper, and respondent alleges on the contrary, that such conduct was at all times governed by professional ethics and by the exercise of respondent's rights as practicing attorney, whereby he considers that he does not deserve any disciplinary sanction by this Honorable Court.

"III—Respondent sets forth that during his twenty-two years of daily professional practice no disciplinary complaint whatever has ever been filed against him in this Honorable Supreme Court, or in the Honorable District Court of the United States for the District of Puerto Rico, or with the Honorable Secretary of Justice, or the Bar Association of Puerto Rico, nor even has he had to answer for contempt proceedings in the practice of his profession, respondent enjoying a spotless reputation among the magistrates as well as among his fellow bar members and in the community.

"FOR ALL THE FOREGOING REASONS, respondent respectfully urges the dismissal of the complaint at bar in all its points."

The hearing for the consideration of said charges was held during March 26, 27 and 28, 1958 before the full Court, except Mr. Justice Pérez Pimentel and Mr. Justice Saldaña, who did not participate. Both parties introduced documentary and oral evidence.[1] They were granted term to present written briefs, which they did, the case being submitted for decision.

The Act prescribes—4 L.P.R.A. § 739—that if after due consideration of the evidence presented by both sides, the Supreme Court should find the complaint, or any material part thereof to be true, it shall make an order for the removal or suspension of the party complained of, according to the seriousness of the charges; and it shall further order that the name of the offender be stricken from the roll of attorneys and counsellors-at-law, and for the purpose of complying with that duty we made a careful analysis and examination of the evidence presented by each part and a careful study of their

---

[1] From the evidence introduced at the hearing of the removal proceeding against Superior Judge Fernando Gallardo Díaz, by oral stipulation made at the beginning of the hearing of the present case of disbarment, petitioner herein offered and had the following admitted as evidence: Exhibits Nos. 3, 4, 5, 6, 7, 8, 9, 10, and 19 for petitioner, and those marked A, B, E, F, G, I, J, K, M, and·N, for the respondent judge, and also the testimonies given therein by Humberto Alvarez, José J. Acosta, Demetrio Luis Latoni, Fausto Ramos Quirós, Luis A. Archilla Laugier (as witness for petitioner therein), José L. Feliú Pesquera, Carlos I. Borges López, Rafael A. Pesquera, Octavio Malavé Torres, Juan Ramón Rivera Ayala, Manuel Menéndez Pesquera, Leandro Miranda Torres, Ana Delia Torres (in part), Juan Amaral (his first testimony), Fernando Grajales Rodríguez, and Fernando Gallardo Díaz. From the same case respondent attorney herein offered and had the following admitted as his evidence, by virtue of the same stipulation: Exhibits Nos. 11, 12, 13, 14, 15, 17, and 18 for petitioner herein, and those marked "C" and "O" presented by the respondent judge, and also, the testimonies given in that proceeding by César Andréu Ribas, Antonio Cortés Ostalaza, Ernesto Juan Fonfrías, José C. Jusino, Víctor Manuel Padilla, Rafael Rodríguez Emma, Armando Santini, Manuel Torres Reyes, Joaquín Correa Suárez, Francisco Ponsa Feliú, and Juan Amaral (second testimony).

In the course of this opinion, in referring to the exhibits or pages of the stenographic record of that proceeding for removal, we shall add to its corresponding letter or number the letters "GD." When certain letters or numbers are not followed by those two letters "GD" it will be understood that we refer to or cite the exhibits admitted for the first time in this case of disbarment or to the stenographic record thereof.

briefs. Considering the credibility deserved by each witness and the probatory force of each documentary piece, we have reached the following

## FINDINGS OF FACT

### First Charge

1. Respondent was admitted to the bar by this Court on June 15, 1936 and as notary public on June 24 of the same year. Petitioner's Exh. 1.

2. In October 1956, two informations were filed in the Bayamón Part of the Superior Court, against Miguel Angel Marín Canals, for violations to the Weapons Act. The first, a felony, under No. G-56-198, concerning § 8 of said Act. The second, a misdemeanor, under No. M-56-251, for violation of § 6, consisting in having carried a pistol without having previously obtained a licence issued by the Chief of Police of Puerto Rico. The cases were jointly submitted to trial presided by Superior Judge Fernando Gallardo Díaz, on January 24 and 25, 1957, with District Attorney Fernando Grajales representing The People and respondent Mr. César Andréu Ribas and Mr. Gilberto Padró Díaz, representing the defendant. In the felony, No. G-56-198, tried by a jury, the verdict was of acquittal. The misdemeanor, No. M-56-251, was decided by said judge, who found defendant Marín Canals guilty and sentenced him to serve six months in jail. Petitioner's Exhs. 3 GD and 4 GD.

3. During the course of the trial, and on the first afternoon, the following incident took place:

"The Court: In this case were there any more people around? I must decide the other case. There were a lot of people there and the district attorney merely took the testimony of the two policemen.

"District Attorney: We have the two policemen and we investigated besides. I have taken steps to get other witnesses.

"The Court: A district attorney should presume and anticipate that when an event occurs early at night and there are many people present, the defense will tell the jury,

'Gentlemen, how is it possible that this event occurred in a public place and that the only witnesses that the district attorney produces are two policemen, when that business place was full of witnesses?'

"Your Honor (addressing the district attorney) could have investigated those who were in the bar. You could have asked them if they saw anything. If, for example, they say that they saw nothing, write down that they do not know anything and under those circumstances, in a case like this, they can not come into court afterwards and say they did see, once having testified that they did not see anything . . . . If it is possible. A citizen should tell the truth of what he saw. If he can, that is enough. But cases can not be conducted that way.

"District Attorney: We say, Your Honor, they can be conducted with one policeman as witness.

"The Court: They can be conducted, but the one who is going to judge has to know about that.

"District Attorney: We took all the pertinent steps.

"The Court: That is not enough. If someone told you he did not know. . . .

"District Attorney: I asked all the witnesses during the investigations and the defendant who did not want to testify . . .

"The Court: That is his own right.

"District Attorney: . . . Not even El Cano, he was asked but not for one moment did he admit having seen anything.

"The Court: Why did you not write it down? If he went to the office of the district attorney, I would take down his testimony and tied him up.

"District Attorney: El Cano did not come to the office right away. It was approximately a month or more after seeing the defendant, that the latter wanted us to take that testimony. Defendant wanted to have El Cano's testimony. But this case occurred on October 7 and it was investigated on the 7th or 8th.

"The Court: You should make everyone come. I used to take 60 testimonies just to use three. I knew it. I would write it down.

"Defense: I am going to request the court to strike the district attorney's remarks concerning the fact that El Cano went to his office.

"District Attorney: I take back everything I said.

"The Court: The jury is not here now.

"Defense: Your Honor, in this same week colleague Grajales was contradicted. Since what he is saying is from memory, I do not want it included in the record.

"District Attorney: Well . . . I take back . . . .

"The Court: What do you take back?

"District Attorney: Everything he said when he was in my office.

"The Court: Marshal, bring in the jury. The jury is complete and it is the same. Defendant and attorneys are present. Call one witness. Let us have the witness who was testifying. The defense may continue questioning him." (Petitioner's Exh. 7 GD.)

4. Defendant took an appeal from the judgment of conviction and on the same date, January 25, 1957, he requested the court to order the stenographer to prepare his notes taken during the trial. It was so ordered by the court on January 29, notifying Juan Amaral, court stenographer. Petitioner's Exh. 3 GD, folios 8 and 9.

5. On March 7, 1957, stenographer Amaral filed a transcript of the evidence, and a hearing was set for its approval for the following May 3, after several postponements. Petitioner's Exh. 3, folios 14, 15, 16, 21, 22, and 23.

6. On March 25, respondent attorney César Andréu Ribas, representing defendant Marín Canals, filed in the office of the clerk of the Superior Court, Bayamón Part, a motion whose text literally reads:

"In the Superior Court of Puerto Rico, Bayamón Part.—The People of Puerto Rico v. Miguel Angel Marín Canals, defendant. Crim. No. G-56-198 M-56-251. For: A Violation of the Weapons Act (Felony) (Misdemeanor) *Motion for Amendments to the Transcript of Evidence.*—Defendant appears through his undersigned attorney and sets forth: 1.—That he received copy of the transcript of evidence prepared, certified and filed by the reporter stenographer Juan Amaral, and as it is pending approval by this court, for the purposes of perfecting the appeal filed against the judgment entered by the court of law, defendant submits the following amendment: 1.—When District Attorney

Grajales finished presenting his evidence and after policemen Aureliano Díaz and Manuel Ralat had testified, Judge Fernando Gallardo asked the District Attorney Grajales: 'Is that all the evidence?' and upon the district attorney answering affirmatively, the judge ordered the marshal to remove the jury from the courtroom, and there ensued a lengthy dialogue between the judge and the district attorney, more or less in the following terms:

"Hon. Judge: Do you mean to tell me that this case occurred in a bar there in Cataño, which is two minutes from here, and you only bring the two policemen to testify, and you did not take the testimony of the owner or manager of the bar or of any other person? Remember that I have the responsibility of deciding one of these two cases, that one is felony and the other misdemeanor, and that investigation is very deficient. When I was district attorney in Guayama and in San Juan, and we had a case like this, I was not satisfied with what the police would tell me but I would go to the place, take the testimony of all the witnesses and anyone who might have been present, even if it was just to tell me that they did not known anything about the case.

"In that way the defense could not bring those witnesses to say that they saw this or that because I already had them tied up with the testimony that they knew nothing.

"District Attorney Grajales: That is all the evidence for The People, and that is the case. I can do nothing else.

"Hon. Judge: Well, you see, now the defendant brings the manager of that place and other persons who witnessed the arrest, he has them outside as witnesses and The People could have investigated them before. Recess.

"2.—That these statements were made by the magistrate and the district attorney during the trial; they form part of what occurred and should be wholly transcribed and yet have been unduly stricken when they should be inserted in the proper place in the transcript of evidence.

"3.—That during the recess the counsel for the defendant approached Mr. Amaral, and later, in the latter's own office, managed to have the remarks which do not appear now in the transcript read to him, whereby *he has reasons to believe that this has not been nor happens to be an involuntary omission in*

*transcribing his notes but rather that those remarks were
stricken from the transcript after the court knew of defendant's
intention to appeal as stated in open court, upon requesting bail
to do so.* For these reasons, defendant urges this court to order
reporter stenographer Juan Amaral to insert in the proper place
in the transcript of evidence (p. 48, before adjourning for lunch
and after having introduced in evidence the pistol and the bullets,
without defendant's objection) all the words, phrases, and
remarks previously transcribed and proposed as amendments by
the defendant, which were said in open court at the trial by
Judge Fernando Gallardo Díaz, and addressed to District At-
torney Grajales, as well as the ones made by the latter, so that
the complete transcript be sent to the consideration of the Hon.
Supreme Court of Puerto Rico, to which defendant is entitled.
San Juan, Puerto Rico, March 21, 1957. (Signed) C. Andréu
Ribas, counsel for defendant-appellant." (The underscoring of
part of paragraph 3 was made by the respondent judge, with a
blue pencil, "the Monday or Tuesday following the incident . . .
in the office of the clerk of the court." R. 1106 GD.) Peti-
tioner's Exh. 3 GD, folios 18–20.

7. Copy of the preceding motion was sent to District At-
torney Grajales. A few days later, and when stenographer
Amaral was visiting the district attorney's office, the latter
gave him the said copy to read. The record—pp. 401–402
GD—relates what Amaral did later, in the following terms:

"Then I went to my office. I read it. I realized what it was
all about. I went . . . to the Honorable Judge's office. I told
him: 'Mr. Gallardo, please look as this paper sheet'; and then
I asked him if he remembered the incident. He told me: 'Look
Juan, if that happened I must have said it during a recess.' I
went there to know my position. Then I went to the Honorable
District Attorney Grajales to find out how things were and the
Honorable District Attorney told me: 'Juan, get your notebooks
because it did happen.' As soon as he said that I went to my
office, took the notebooks, began to check them. At first I could
not locate the incident. Then I decided to take the first note-
book page by page, until I got to the place where I found the
incident; and then I put some paper in the typewriter and tran-
scribed it immediately. Then I talked to the district attorney,

the Honorable District Attorney, and told him that I was going to write a letter to Mr. César Andréu Ribas, in certain terms which I told him."[2]

8. On March 27, Amaral sent by mail to the respondent attorney the part omitted from the transcript with a letter that reads:

"Dear friend: I am enclosing the additional sheets that should be inserted in the transcript of evidence of the Marín Canals case, containing the incident that I involuntarily and inadvertently omitted to transcribe. I deeply regret it because that omission has caused Your Honor to set forth rashly (of this I am sure, because we have been good friends), certain remarks in your motion for amendments. When we recall what we talked about on January 25, the truth will be clarified and Your Honor, with that noble gesture that characterizes you, shall request that they be stricken from the record. Until then, I remain, Yours truly, (Sgd.) Juan Amaral." (Petitioner's Exh. 6 GD.)

---

[2] When Amaral was questioned concerning the cause of his failure to transcribe 26 pages of his notebook of stenographic signs, which included the dialogue between judge and district attorney, mentioned in the motion, he gave the following explanation:

"When I begin to make a transcript of evidence I go to the office of the clerk of the court and find the original record. Then I locate the notebooks and find the place where the hearing of the case begins. Then I made a crease in the page where the testimony begins and where the cross-examination begins and ends, and so forth, in order to know exactly the work that I have to do. In this specific case of Miguel Angel Marín Canals there are a few notebooks. I could not make a record all at once, that is, sit down at the typewriter and dedicate myself exclusively to transcribe that record because in Bayamón there is only one stenographer. I have to go to courtroom every day when there is trial. The work is done when I am not busy in courtroom. I do it on Saturdays or Sundays. Then the work progresses; but I am interrupted on different occasions. Either because I have to go to courtroom to occupy the chair there and work or because I am called on the telephone or because on Friday the attorneys need their ex-parte records fast. And so forth, or because I am called on the telephone. Then I take the notebook and I fold the page where I leave off and surely enough I do not know if I left the notebook open like this, see? When I made the mark I do not know if I left the notebook like this. The point is that when I went again to transcribe after I was interrupted and I went back to transcribe, either the wind blew those pages or I took a different starting point from the one I should have taken and that is what happened."

9. After calling the case of Marín Canals, on the morning of May 3, for the purpose of the approval of the transcript of evidence, the following dialogue took place between Judge Gallardo Díaz and Mr. César Andréu Ribas:

"DEFENSE: Mr. César Andréu Ribas: I proposed some amendments to the stenographic record, which are attached to the record of this case. Your Honor will remember that on the day of the trial and after having presented the testimony of the two policemen whose names appeared at the back of the information, Your Honor ordered the withdrawal of the jury and asked District Attorney Grajales 'if that was the evidence for the case'; that was after he presented in evidence the revolver and the bullets. And then Your Honor, addressing the district attorney, made certain remarks, which I took down, Your Honor, as fast as possible in longhand, as I am no stenographer, which briefly are the following and which I have included in the 'Motion for Amendments to the Transcript of Evidence':

"THE COURT: Hon. F. Gallardo Díaz, Judge: Was that in the absence of the jury?

"DEFENSE: Yes, Your Honor. I shall read the incident. 'Is that all the evidence?' and upon the district attorney answering affirmatively, the judge ordered the marshal to remove the jury from the courtroom, and there ensued a lengthy dialogue between the judge and the district attorney, more or less in the following terms: Judge: 'Do you mean to tell me that this case occurred in a bar there in Cataño, which is two minutes from here, and you only bring the two policemen to testify, and you did not take the testimony of the owner or the manager of the bar or of any other person? Remember that I have the responsibility of deciding one of these two cases, that one is felony and the other misdemeanor, and that investigation is very deficient. When I was district attorney in Guayama and in San Juan and we had a case like this, I was not satisfied with what the police would tell me, but I would go to the place, take the testimony of all the witnesses and anyone who might have been present, even if it was just to tell me that they did not know anything about the case. In that way the defense could not bring those witnesses to say that they saw this or that because I already had them tied up with the testimony that they knew nothing . . . .'

"THE COURT: But I have never in my life used the words 'tied up' . . . .

"At this moment the stenographer addresses the Hon. Judge and says: The incident is transcribed, and furnishes him with the original copy, because on March 27, 1957, he had already served copies thereof to the parties' attorneys.

"THE COURT: . . . I remember there was something along that line.

"DEFENSE: If Your Honor will allow me to continue reading. Later, Mr. Grajales answered him: 'That is all the evidence for The People and that is the case; I can do nothing else.' "I received a copy of the transcript of the incident, accompanied with a letter from stenographer Amaral, who is an officer for whom I have great respect, and now I would like to say it publicly, that I regret this whole incident, and with Your Honor's leave, I want to state here publicly, before the court, my opinion of Mr. Amaral . . . .

"Then I read the transcript of the incident that I have alleged was omitted in the transcript of evidence, and I saw that the incident transcribed by Mr. Amaral is more or less the same thing that I took in longhand, but with more details, and I agree with the incident.

"But I also want to say that I must watch for the rights of my client on appeal. Your Honor, that is why I filed that motion that I have just read requesting amendments to the stenographic record.

"Later I received a letter from Mr. Amaral, Your Honor, to which were attached pages 79, 79A, 79b, 80, and 81, in which letter Mr. Amaral actually complains and tells me as follows: (The letter that appears transcribed in Finding No. 8 follows.)

"DEFENSE: *Therefore, I accept in the first place that it was an involuntary omission on Mr. Amaral's part. I also accept as correct what has been transcribed in these pages that Mr. Amaral sent me with his letter.* That is all that I had to say concerning the amendments. Now I would like to say something with regard to Mr. Amaral, because I wanted to say it here before the court, its officers, the public, and the members of the bar, and that is the following: '*I hold Mr. Amaral in high esteem as an officer, and in all his capacities; he is a correct citizen, a correct and honest officer* and I had not answered his letter because I wanted to say it here before the court.'" Petitioner's Exh. 3 GD, folios 30, 34. (Italics ours.)

10. In the transcript of evidence prepared by stenographer Juan Amaral, and which he filed on March 7, 1957, said stenographer failed to include the dialogue between judge and district attorney, which, in its pertinent part, is inserted in the preceding Finding No. 3, and which occurred on the afternoon of January 24, 1957 in the absence of the jury, at the trial against Marín Canals, and after the district attorney announced the close of his evidence; neither Judge Fernando Gallardo Díaz nor District Attorney Fernando Grajales Rodríguez had anything to do whatsoever with the omission of that dialogue. Petitioner's Exh. 6 GD; R. 398, 431, 469, 471 GD.

11. In 1942 there arose a relationship of intense personal enmity between respondent Judge Fernando Gallardo Díaz, and the attorney César Andréu Ribas, which, with apparent periods of indifference, has persisted through the years, and made manifest in different ways. Petitioner's Exh. 15 at pp. 57–62 GD; respondent's Exhs. A. B, F, J, K, and L, GD.

## SECOND CHARGE

12. As soon as the respondent attorney finished saying the words contained in the last paragraph of the quotation transcribed in the preceding Finding No. 9, he took his briefcase, closed it, took his hat and proceeded to leave the courtroom. At that moment the following dialogue took place between him and Judge Fernando Gallardo Díaz:

"THE COURT: *I had never read this or knew that it had happened until this very moment. But I see here that Your Honor in referring to me calls me 'Judge Fernando Gallardo,' 'Mr. Judge,' and I do not care if I am not called honorable because I know that I am honorable, whether you think so or not . . . .*

"DEFENSE: *With apologies to the court . . . . I did not come here so that Your Honor, taking advantage of your position as judge, should come and tell me those things . . . .*

"THE COURT: *Well, I say it here and outside of the court and anywhere . . . .*

"DEFENSE: *That's just what I want . . . . Come on . . . . come on . . . .*

"THE COURT: *Recess.*"   Petitioner's Exh. 3 GD, folios 30–35. (Italics ours.)

13. During the preceding dialogue, the judge was sitting down; Mr. Andréu Ribas was standing, facing the clerk's table.  Pounding on the desk, the judge called a recess, he suddenly stood up—R. 289 GD—turned to his right, came down from the bench and began to walk towards Mr. Andréu Ribas, who was standing near the table of the court attorneys. —R. 250, 323, 335 GD.—Both were excited and nervous. Then marshal Juan Ramón Rivera Ayala, "fearing that something might happen"—R. 552—stopped Judge Gallardo Díaz and "held him by the arms"—R. 358, 499, 882 GD—preventing him from advancing.—R. 525 GD.—The assistant marshal and "a great many attorneys" also intervened with the judge, advising him to keep calm—R. 529, 553 GD—and pushed him or shoved him—R. 70, 453, 499 GD—towards a small hallway that leads to the jury room; just as they had led him into that hallway and still being near the threshold of the door leading to that hall, Judge Gallardo Díaz said to those who were holding him: "Let me go, he's just a *'pendejo.'* "—R. 290, 500 GD.  To these words respondent Andréu Ribas, with whom District Attorney Grajales and other attorneys had intervened—R. 249 GD—retorted: "You are a bigger *'pendejo'* yourself."—R. 500 GD.

14. The judge was taken to his office where he took an Equanyl.—R. 114 GD.   District Attorney Grajales took hold of Andréu Ribas by the arm, seated him in an armchair and later took him to his office; there he offered him a tranquilizer but he did not take it.—R. 328 GD.   The judge left his office and came down from the second story of the building towards the place where he had parked his car with the "intention of going to my automobile and getting the revolver from the dashboard and bringing it with me," he changed his mind and returned without the revolver, resuming the court session.

—R. 1115 GD. From the office of the district attorney respondent Andréu Ribas went to San Juan, where he attended other cases.—R. 49, 328 GD.

15. As a result of the incident between judge and attorney, the proceedings were interrupted for some time. Some witnesses testified that the interruption lasted forty-five minutes —R. 376 GD—others thirty—R. 537 GD—and others, twenty-five—R. 532 GD—others "not less than fifteen,"—R. 362 GD.

I

In the first charge petitioner maintains that in drafting and filing the transcribed motion for amendments to the stenographic record prepared by Juan Amaral for the appeal in the Marín Canals case, attorney César Andréu Ribas behaved in an immoral and improper manner unbecoming an attorney, consisting in that: a) he made the implied charge that there was connivance between the court and stenographer in order to strike, as it was stricken from the transcript of evidence, the incident which occurred during the hearing of the case, between Judge Gallardo and District Attorney Grajales, for the alleged purpose of depriving the defendant of his right to assign as ground for error in the appeal the remarks uttered by Judge Gallardo in said incident concerning the equality of the evidence for the prosecution; b) that the alleged charge is false and was made by the respondent attorney without proof of its certainty and without any probable cause or ground to believe in the truth thereof, and c) with the malicious intention of impairing the honesty and integrity of the court and of the Judge, Mr. Gallardo, which was all in violation of the duties that respondent, as an attorney, owed said court and judge.

Considering the finding of fact made by this Court and the additional circumstances which we shall set forth in our opinion said first charge was fully proved. Let us see.

a) After the respondent attorney set forth in his motion for amendments the essential facts for its consideration, that

is: that for the purpose of the appeal taken by the defendant, the transcript of evidence had been prepared; that it did not include the incident which occurred between judge and district attorney that was recited in said motion and that the remarks uttered by both officers should be included in the transcript, and the court was urged to do so, he adds, to said motion, the following paragraph:

"3.—That during the recess the counsel for the defendant approached Mr. Amaral, and later, in the latter's own office, managed to have the remarks which do not appear now in the transcript read to him, whereby he has reasons to believe that this has not been nor happens to be an involuntary omission in transcribing his notes but rather that those remarks were stricken from the transcript after the court knew of defendant's intention to appeal as stated in open court, upon requesting bail to do so."

Petitioner labels the contents of that third paragraph as an "implied" charge of connivance between the court and the stenographer for the purposes of depriving the defendant, maliciously, of his right to assign as error, in the appeal, the judge's remarks on the quality of the evidence for the prosecution. It is clear that the words of the paragraph constitute such "implied" charge. But it is the respondent himself who is taking care of drawing away the veil that covered said charge, and pointing out the person he considered as the real author of the involuntary omission, on the following occasions:

(1) When he testified, under oath, before district attorneys Aponte and Gil, on May 13, 1957, among other things he said:

"Since I noticed when the record came that the pages in question were missing, upon drafting the motion I really gave the impression that it had not been an involuntary omission but rather on behalf of someone's interest and I logically assumed that the only one interested in not writing those statements, said in trial, in a case from which an appeal was going to be taken to the Supreme Court, was the judge who had said them, since Mr. Amaral had given me his personal assurance that he would

transcribe everything that had occurred and I had had the opportunity to show him what I had taken in longhand. (Petitioner's Exh. 19, p. 19.)

".     .     .     .     .     .     .     .

"I believe that there I am telling the judge that, after the defendant had said that he would appeal, the judge realized that these gratuitous phrases on the quality of the evidence for the prosecution were going to be my first ground for having his judgment reversed. That is all the abuse that I attribute. (Petitioner's Exh. 19, pp. 20–21.)

".     .     .     .     .     .     .     .

"DISTRICT ATTORNEY:

"As to the incident of the amendments to the stenographic record, must we believe that my colleague was under the impression that it had not been an involuntary omission, but rather a deliberate one?

"WITNESS:

"I had the moral conviction that Judge Gallardo gave instructions, like on other occasions, not to put down some of the things he said in court."    (Petitioner's Exh. 19, pp. 24–25.)

(2) When he replies to the charges, he sets forth in part:

". . . respondent alleges that he had strong grounds to believe, as he believed in good faith, that such involuntary omission took place *not on stenographer Amaral's initiative* . . . ."    (Italics ours.)

(3) When he testifies, under oath, before us, he says in part:

"A. I am going to be frank with you; I will tell you that it would not be a great distrust.   I had some distrust, not great distrust, colleague.   Some distrust because of all I knew.   I do not pass judgment on the spur of the moment, or anything like that.   All those things made me believe that perhaps either Mr. Amaral on his own initiative in order not to harm the judge who took him there and has been his friend for so many years, or the district attorney himself in order not to have in an appeal in the Supreme Court Mr. Gallardo's opinion of him, or any interested person could arrange it so that that would not appear when it came here . . . ."    (R. 75–76 GD.)

".     .     .     .     .     .     .     . .

"A. Well, what happened in my opinion, was that someone in the court—I already told you who it could have been—well, this is it: either Amaral has not dared to include this. Second: It could be that the judge told him: 'I said that off the record, do not put it.' It could be that since District Attorney Grajales is a young man who is beginning his career, he did not want the statements of an experienced judge as Mr. Gallardo, on the quality of his investigation, to appear in the Supreme Court. I thought of many things, without reaching any conclusion." (R. 87 GD.)

(4) And when he drafts his brief, insofar as pertinent, he sets forth:

"Respondent was certain, then, that *the judge and the stenographer of Bayamón were perfectly capable of intentionally omitting from a transcript something that was not to the judge's advantage,* and that in fact they had associated or agreed to do it on at least one former occasion." (P. 11, italics ours.)

"The omission was voluntary, since it was deliberate. And in the omission there was and is basis to believe that the judge took part." (P. 18.)

*b)* The serious charge that respondent made in his motion was not proved. There does not exist in the evidence introduced the slightest principle of legal, effective, and trustworthy proof which might give us the moral certainty or the conviction that the judge or the district attorney ordered, adviced, or insinuated to the stenographer to omit in his transcript any part of what was said in courtroom. The only author responsible for the omission was stenographer Amaral.[3] He thus sets forth in his letter of March 27 to the re-

---

[3] Respondent thus said, on the morning of May 3, while he addressed the court: ". . . I accept in the first place that *it was an involuntary omission on Mr. Amaral's part.* I also accept as correct what has been transcribed in these pages that Mr. Amaral sent me with his letter . . . . Now I would like to say something with regard to Mr. Amaral, because I wanted to say it here before the court, its officers, the public, and the members of the bar, and that is the following: 'I hold Mr. Amaral in high esteem as an officer, and in all his capacities; he is a correct citizen, a correct and honest officer . . . ." Petitioner's Exh. 3 GD, folio 34. (Italics ours.)

spondent and he admitted it, under oath, before the district attorneys and us.

Respondent never had the certainty or the clear and definite knowledge that the judge or the district attorney intervened in the commission of the omission, nor probable cause or ground to believe in the truth of the charge made in the motion. He assumed that "the only one interested in not writing those statements, said in trial, in which an appeal was going to be taken to the Supreme Court, was the judge who had said them." Petitioner's Exh. 19, p. 19.[4]

As he himself testifies, upon receiving the transcript for the first time, examining it and noting the absence of the dialogue between the judge and the district attorney, his first impression was: "Look, just as I thought."—R. 86 GD. Then began the line of ideas parading in his mind in search of the person responsible for the omission. He focused his thought towards "someone in the court." He thought "that Amaral has not dared to include this." He thought that "it could be

---

[4] Respondent gave diverse explanations as to his intention or thought in drafting the motion for amendments. In the course of his testimony before us, among other things, he was asked and answered the following:

"The colleague having stated that in the third paragraph where the term 'court' appears in 'small letters,' the presiding judge was also included I ask, why does he on May 3, and when he offers explanations and apologies, merely address them to the stenographer and does not include the judge in those explanations?

"A. I tell the colleague that the judge who fixed bail, the district attorney who was served with the notice of appeal, and the stenographer who received an order to transcribe the evidence learned about my notice of appeal that same day and then, my amendments are addressed to a person who is going to do the job mechanically, that person supplies me what has been omitted, writes me a letter which I believe I should answer —I could have done it in writing, I preferred to do it personally—since I did not have to give excuses to Hon. Judge Gallardo, because at no time up to the moment of this incident has Judge Gallardo told me: 'You put this and it refers to me.' If he would have told me there: 'Look, were you including me when you said this here?'—'No, Your Honor,'—and I would have left.

"Q. In other words, your explanation is simple, it is just that since Hon. Judge Gallardo did not ask you for an explanation or apology, you believed that you did not have to give any?

"A. Since it was not addressed to him either, I did not have to give

that the judge told him 'I said that off the record, do not put it.' " He thought that since District Attorney Grajales "is a young man who is just beginning his career he did not want the statements of an experienced judge as Mr. Gallardo, on the quality of his investigation, to appear in the Supreme Court." And he rejected all those ideas because he himself finally testified before us: "I thought of many things, without reaching any conclusion." R. 87 GD.

When the respondent attorney was interrogated as to what was his thinking process and mental attitude, not at the moment of receiving the transcript and noting the absence of the dialogue, but at the moment in which he drafted his motion for amendments, he testified:

"A. I explained to you this morning, colleague, that my mental attitude upon receiving the incomplete transcript, then, obeyed the natural surprise of a person who had talked about this matter with Amaral. Originally, then, many things crept to my mind. It seemed strange to me for a stenographer of Amaral's experience to have omitted such a long part when he

---

them to him, in the same way that I did not have to give them to District Attorney Grajales.

"Q. Should Hon. Judge Gallardo have asked for those explanations, would you have given them to him?

"A. The same as if Mr. Grajales would have told me: 'Andréu, were you referring to me in this?' I would have said: 'No, sir.'

"Q. In other words, on May 3, 1957, you were convinced that the Hon. Judge Gallardo had had nothing to do with those omissions of that incident?

"A. I accepted the explanation that Juan Amaral gave me in his letter of March 27, and I was forced to go like a gentleman there and say many things that I said about him in that place.

"Q. In other words, on May 3, 1957, *you were convinced that the Hon. Judge Gallardo had, had nothing to do with the omission of that incident* which appeared afterwards with the sheets that Juan Amaral added?

"A. *I was convinced of it because Mr. . . . . I never said it was he.* And besides, because Mr. Juan Amaral assumed the responsibility when he told me: 'I omitted it involuntarily.' When he assumes the responsibility I have no right to keep insisting that it was someone else. *Nor did I ever say that it was the judge. Look, had I known that it was the judge, I would have had enough civic courage to say:* 'Judge Gallardo struck it.' But I *do not make such charges against anyone and much less a judge.*" R. 100–103 GD. (Italics ours.)

had told me that indeed he was there and had read me part . . . when he had admitted to me when I had gone to him that everything was in order, that I should not worry, well, that seemed strange to me and naturally, *I reacted, since I did not have the moral certainty whether it had been Amaral's doings, whether it had been Grajales' request for it not to come here, whether it had been suggested by the Hon. Judge,* so I said: I am just going to make a motion showing that I have what happened that day and asking the court to give me a chance to prove it.' " R. 204 GD. (Italics ours.)

He also testified to us that if he "would have believed or tried to charge Mr. Gallardo with having been the one who struck from the record, he would have said expressly 'Mr. Gallardo struck from the record' but he would have never done it knowing that he is his personal enemy. He would have never said it unless he had evidence so strong that even he himself [Gallardo] would have had to admit that it had been he." R. 205 GD.

Under these circumstances petitioner's assertion that the respondent attorney made the charge without having probable cause or well-grounded reason to believe in the truth thereof is obviously correct. The constant situation of enmity between the latter and the judge; what he presumed or the ideas that "knocked his brain," his attitude of distrust, the attorney's self-knowledge or knowledge acquired by information from only one side that on previous occasions Amaral had failed to include in other transcripts certain statements of the same judge—omissions whose nature, origin, purposes, results, and persons responsible were never determined—cannot be considered as serious ground or sufficient basis to believe, or infer that, surely enough, Judge Gallardo Díaz or District Attorney Grajales, or both, in connivance with the stenographer, had excluded the referred dialogue in the transcript prepared in the Marín Canals case.

*c)* What is openly unfounded in that serious charge of dishonesty arises, primarily, from the absence of a true fact or probable cause to believe in the truth thereof; secondly,

that it was completely unnecessary for the purposes of completing the record—respondent himself admitted that "Perhaps it was not necessary,"—R. 207 GD; thirdly, because respondent considered it, notwithstanding the fact that he did not have moral certainty that it was true, the best or most suitable method for transcribing the pages that were missing from the transcript. *Cf.* R. 916 GD.

An unjustified charge of that nature, whereby mainly the judge and the court stenographer were the ones accused of having conspired to prepare a false transcript of evidence in prejudice of a defendant-appellant,[5]—criminal acts, §§ 62, 128, and 146 of the Penal Code—filed consciously[6] by an attorney of the experience and professional ability of the respondent, constitutes sufficient cause to discipline him pursuant to the statute and the Canons of Professional Ethics.[7]

---

[5] On page 17 of his brief respondent affirms: "It was obvious that respondent was not going to tolerate falsifications of the transcript of evidence. His motion showed it clearly."

[6] Respondent testified that in drafting his motion for amendments he acted "consciously" as to the meaning of his terms. R. 206 GD. In his brief, at p. 11, he set forth:

"Respondent was positive, then, that the judge and the stenographer of Bayamón *were perfectly capable of intentionally omitting* from a transcript something that was not to the judge's advantage, and that as a fact they had associated and agreed to do so in at least one previous occasion. Respondent was sure of this because both Cintrón Ayuso brothers *had told him* at the time when that omission occurred, and it was all prior to the other omission of the incident in the said criminal prosecution." (Italics ours.)

[7] "An attorney or counsellor who is guilty of any deceit, malpractice . . . in connection with the practice of his profession . . . may be suspended or removed from office by the Supreme Court of Puerto Rico." 4 L.P.R.A. § 735. Under our inherent power to determine who may practice law in our courts we may disbar any member of the bar who is unworthy of being one. *In re Abella*, 67 P.R.R. 211, 219 (1947); *In re Bosch*, 65 P.R.R. 232, 234 (1945); *In re Arroyo*, 63 P.R.R. 764, 766 (1944).

Canon 1 reads thus:

"*The Duty of the Lawyer to the Courts.*—It is the duty of the lawyer to maintain towards the Courts a respectful attitude, not for the sake of the temporary incumbent of the judicial office, but for the maintenance of its supreme importance. Judges, not being wholly free to defend themselves, are peculiarly entitled to receive the support of the Bar against unjust criticism and clamor. Whenever there is proper ground for serious

■ Any charge, oral or written, of the commission of illegal or immoral deeds, filed by an attorney, that is not warranted by competent evidence, that tends to degrade or impair the dignity, respectability, and integrity of the courts or its officers or that can weaken or destroy the respect or public confidence therein, is to be considered just cause for taking disciplinary action. 5 Am. Jur. *Attorneys at Law,* §§ 265–66; 7 C.J.S. *Attorney and Client,* § 23 at 752, 753; Annotation in 14 A.L.R. 868–871; 6 Cal. Jur. 2d § 85. See: *In re Gross,* 177 Atl. 767 (1935); *Attorney General* v. *Nelson,* 249 N. W. 439, 444 (1933); *In re Huppe,* 11 P.2d 793, 797 (1932); *In re Troy,* 111 Atl. 723 (1920); *In re Hilton,* 158 Pac. 691 (1916); *Pittsburgh etc.* v. *Muncie, etc.,* 77 N. E. 941, 942 (1906); *In re Philbrook,* 105 Cal. 471, 475 (1895).

■■ The right to practice law is not a vested right, but a privilege; the obligation which an attorney assumes does not merely consist in obeying our Constitution and the statutes in force; it also consists, as a cosubstantial part of that obligation, in the duty to maintain, at all times, the respect due to the courts of justice and judicial officers, without impairing the right to uphold a vigorous defense and criticize with well-grounded reason and in a respectful manner the conduct of judicial officers.

■ Healthy and timely judicial criticism is necessary and constitutes effective means to maintain the judges alert and attentive to the strict compliance of their functions. But it

---

complaint of a judicial officer, it is the right and duty of the lawyer to submit his grievances to the proper authorities. In such cases, but not otherwise, such charges should be encouraged and the persons making them should be protected."

Insofar as pertinent, Canon 22 reads:

"*Candor and Fairness.*—The conduct of the lawyer before the Court and with other lawyers should be characterized by candor and fairness.

". . . . . . .

"It is unprofessional and dishonorable to deal other than candidly with the facts . . . in drawing affidavits and other documents, and in the presentation of causes." *Cf. In re Cruz Disdier,* 70 P.R.R. 428 (1949); *In re Longchamps,* 65 P.R.R. 440 (1945).

should not trascend the limits of truth, decency, and propriety in the course of its criticism because nothing tends more to destroy the just balance of judicial conscience and degrade and mar the impartial and straightforward administration and free course of justice than a flase, unjustified, and vicious criticism. On the other hand, as our Canon 15 acknowledges, "Nothing operates more certainly to create or to foster popular prejudice against lawyers as a class and to deprive the profession of that full measure of public esteem and confidence which belongs to the proper discharge of its duties than does the false claims . . . ." *Cf.* Frederic C. Hicks, Ethics of the Bench and Bar 448, 457; Henry S. Brinker, Legal Ethics 69–79.

We said in the case of *Cordero* v. *Rivera*, 74 P.R.R. 548, 571 (1953) :

"... Because of their position in society and their condition as officials of the court, attorneys must be cautious in making imputations against a Judge of such a magnitude and scope, [charging error in the weighing of the evidence 'with bias, passion, and prejudice'] and they should only do so when they are convinced, deep in their conscience—clear of all prejudice at the same time—that their accusation is true, and then exact the responsibility which such dereliction of duty entails . . . ."

The evidence offered by the petitioner supported also the second charge of the complaint which refers to respondent's conduct during the incident of May 3, 1957. There is no doubt that in that incident respondent observed a defiant and contemptuous attitude toward the presiding judge and in detriment to the dignity, prestige, and good name of the court. It is evident that no attorney can go to these extremes just because he feels upset over an action or expression of a judge.[8] Although it is incumbent on the judges to do every-

---

[8] It is unnecessary to decide, in considering this second charge, whether respondent's action does or does not constitute "malpractice" in accordance with the legal provision applicable. The power of this Court to discipline the members of the bar is not derived from law. It is an inherent power, *In re Pagán*, 71 P.R.R. 712 (1950), which permits us to discipline an at-

thing in their power to maintain the dignity and respect of the judicial proceedings, we cannot allow a momentaneous transgression of that judicial duty to serve as an excuse for an attorney who, going beyond what the circumstances require, rebukes the judge and challenges him to a fight. Judges and attorneys, as the main characters in the drama of justice, are bound to preserve the indispensable dignity of the proceedings through the daily application of standards of urbanity and mutual respect. As up to the present, this Court must watch the conduct of judges and attorneys, and when the circumstances so require, it shall use its disciplinary powers to prevent that conduct from impairing the respect and dignity that should exist in a courtroom.

After carefully considering all the circumstances of both charges, including the conduct of the judge who participated in the proceedings, we believe that respondent César Andréu Ribas should be suspended from the practice of law in our jurisdiction for a period of six months.

Mr. Justice Pérez Pimentel, Mr. Justice Saldaña and Mr. Justice Belaval did not participate herein.

---

Mr. Justice Santana Becerra, dissenting as to the second charge.

I agree with the opinion of the Court concerning the first charge. The evidence does not show that the respondent observed immoral conduct with regard to the events which occurred in open court on May 3, 1957, object of the second charge, even though it is unquestionable that his conduct was improper. Notwithstanding the judge's statements as to the respect that, in his opinion, respondent owed him, the latter's behavior at such statements was disrespectful and might have

torney for any unworthy conduct. *In re Abella*, 67 P.R.R. 211 (1947). There is no doubt that respondent's conduct in the incident of May 3, 1957 was "improper for an attorney and in detriment of the prestige, dignity, and good name of the court and the administration of justice" as is prayed in the charge filed against him. It also constituted a violation of Canon 1 of the Canons of Professional Ethics.

warranted immediate corrective action as contempt of court. But even so, I do not believe that such behavior which, as I state in my opinion of this same date in the case against Superior Judge Hon. Fernando Gallardo Díaz, was produced in the heat of momentary passion, when considered separately and in the light of other proved circumstances, gives rise, in my opinion, to the extreme penalty of disbarring respondent from practicing law.

I believe that César Andréu Ribas should be suspended from the practice of his profession for his implied accusation against the court, lacking in truth, of having tried to alter a record on appeal. That is a serious charge that tends to destroy the public confidence in the purity, honesty and efficiency of the administration of justice. A magistrate who indulges in such practice should not for a moment longer exercise the delicate mission that the community has placed in his hands, but the attorney who makes such a charge, without being true, is guilty of one of the most condemnable unprofessional practices of the bar.

---

Separate vote of MR. JUSTICE BELAVAL, disqualifying himself to participate herein.

At the close of the separate hearings of the two complaints filed against Hon. Judge Fernando Gallardo Díaz and attorney César Andréu Ribas, I left the courtroom of this Court fully convinced that we were dealing with a fallacious case, one of those cases dramatized to the point of absurdity, and that if any disciplinary action or censure was warranted for the purpose of setting an example rather than for ethical strictness, it was because a judge and an attorney had taken part in a task of mutual disrepute, without taking into account the harm that such conduct would ostensibly inflict upon their respective offices. It was my view at that time, that since the case was of slight importance, both complaints should be disposed of by a simple order, one way or another.

Four or five days before disposing of the complaint against Hon. Judge Fernando Gallardo Díaz, it was clear and definite that my brethren held conflicting views as to the most important aspects of the complaint. Realizing that my vote would decide the question one way or another I studied the case with the extra deliberation that a separate opinion or the opinion of the majority requires.

An examination of the brief presented by Mr. César Andréu Ribas' attorneys convinced me that in order to answer the grounds alleged by respondent's brief, it would be necessary to apply, reverse, distinguish, explain, or modify the ruling laid down by this Court in the case of *In re González*, 65 P.R.R. 357 (1945) (De Jesús), in which I was the judge in question; a case in which today I have no other interest than the waning interest left by certain sad events erased with the passing of time, but which prevail in our legal doctrines. Notwithstanding the correct attitude displayed by Andréu Ribas' attorneys in arguing their point, and the excellence with which the case was applied to the facts of the complaint against attorney Andréu Ribas, to my mind it was an implied motion for disqualification. After both complaints, so closely interrelated, were heard, I did not deem it convenient in the best interests of this Court, to make use of the rule of necessity and participate in one decision and disqualify myself in the other.

On the following morning I informed my brethren of the impossibility of participating in the decision of any of the two complaints, and my reasons for acting thus. That these reasons were not set forth in the order entered in the cases against Judge Gallardo does not change the problem of conscience. For the same reasons I will not participate in the decision of this case either.